21-cv-622 Summary Judgment Memo Op V.2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| LYNDON SOUTHERN INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 2:21-cv-00622-MHH |
| PREMIER KINGS, INC., | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lyndon Southern Insurance Co. has asked the Court to declare that an insurance policy the company issued to defendant Premier Kings, Inc. does not cover Premier's claim arising from a September 2020 fire. (Doc. 21). Premier counterclaims that Lyndon has breached the parties' insurance contract and acted in bad faith by failing to pay Premier's claim. The parties have filed summary judgment motions. (Doc. 60; Doc. 62). Premier also has filed three related evidentiary motions. (Doc. 63; Doc. 73; Doc. 74).[1] This opinion addresses these motions. The opinion begins with the procedural standard that governs cross

---

[1] These motions are Premier's motion to preclude Gene Walker James's expert testimony, motion to strike Amy C. Johnson's expert testimony, and motion to strike Howard Fishbein's affidavit testimony.

motions for summary judgment. The Court then summarizes the evidence and procedural history of the parties' dispute, before turning to the legal issues presented in the parties' motions.

**I.**

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a motion for summary judgment, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). "A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see also*

*Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage.").  Even if a district court doubts the veracity of the evidence, the court cannot make credibility determinations; that is the work of a factfinder.  *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Still, conclusory statements in a declaration cannot by themselves create a genuine issue of material fact.  *See Stein*, 881 F.3d at 857 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Cross-motions for summary judgment do not alter the Rule 56 standard. *United States v. Oakley*, 744 F.2d 1553, 1555–56 (11th Cir. 1984).  When considering cross-motions for summary judgment, district courts "should be very careful in their analysis to ensure that the proper party receives the benefit of the summary judgment standard." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 959 (11th Cir.), *cert. denied*, 144 S. Ct. 103 (2023).  When parties file cross-motions for summary judgment, the district court has "three options:  granting summary judgment for the plaintiff under the defendant's best case, granting summary judgment for the defendant under the plaintiff's best case, or denying both motions for summary judgment and proceeding to trial." *FCOA*, 57 F.4th at 959.

The Rule 56 standard applies to affirmative defenses. *See Burns v. Gadsden State Community College*, 908 F.2d 1512, 1519 (11th Cir. 1990) (reversing summary

judgment for a defendant where genuine issues of material fact affecting an affirmative defense precluded summary judgment). A party is entitled to summary judgment based on a defense only if "the evidence supporting that defense is so compelling as to establish that no issue of material fact actually exists." *Molenda v. Hoechst Celanese Corp.*, 60 F. Supp. 2d 1294, 1301 (S.D. Fla. 1999), *aff'd*, 212 F.3d 600 (11th Cir. 2000).

The burden of proof in this diversity action "is a substantive issue and is therefore controlled by state law." *Wynfield Inns v. Edward LeRoux Grp., Inc.*, 896 F.2d 483, 491 (11th Cir. 1990) (citations omitted). In Alabama, "proof by substantial evidence shall be required to submit an issue of fact to the trier of the facts." ALA. CODE § 12-21-12(a).[2] "Substantial evidence" means "evidence of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions as to the existence of the fact sought to be proven." ALA. CODE § 12-21-12(d).

## II.

Premier Kings owns and operates Burger King restaurants in several states, including Alabama. (Doc. 21, p. 3. ¶10; Doc. 46, p. 2. ¶10). Lyndon Southern

---

[2] Federal courts sitting in diversity jurisdiction apply state substantive law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The Court applies Alabama substantive law to resolve the parties' motions because the insurance policy at issue does not contain a choice of law provision.

Insurance Co. issued Premier a business insurance policy, Policy Number QSR1000076-01, with a policy period of March 29, 2020 to March 29, 2021. (Doc. 59-9, pp. 5–156; Doc. 60-1 pp. 2–153). The policy provides that Lyndon would "pay for direct physical loss of or damage to Covered Property" at covered premises "caused by or resulting from any Cause of Loss." (Doc. 60-1, p. 26). The policy covers, among other premises, a Burger King located at 1555 Montgomery Highway in Hoover, Alabama. (Doc. 59-9, p. 6; Doc. 60-1, pp. 2–3; *see* Doc. 21, p. 3 ¶11). Under the policy, "Covered Property" includes buildings and business personal property. (Doc. 60-1, p. 26). The policy also covers losses of business income. (Doc. 60-1, p. 31). Under the policy, "Covered Causes of Loss" include "[d]irect physical loss," such as "fire." (Doc. 60-1, p. 27; Doc. 60-3, p. 12, tpp. 41:21–42:4).

On September 9, 2020, Rodrickus Singleton set fire to the Hoover Burger King. (Doc. 59-8, p. 8; Doc. 59-3, p. 97). Mr. Singleton had worked at the Hoover Burger King for nearly one year, (Doc. 59-8, p. 34); he was the store's general manager, (Doc. 59-6, p. 6, tp. 18:12–17, 19:18–20:4). Before Premier hired Mr. Singleton, the company performed a background check. (*See* Doc. 59-8, pp. 2, 22–41). The background check showed that Mr. Singleton had pleaded guilty to felony theft in April 2011. (Doc. 59-8, p. 34). For that crime, Mr. Singleton completed a term of probation in April 2014. (Doc. 59-8, p. 34). The background check did not reflect other criminal activity. (*See* Doc. 59-8, pp. 22–41).

In May 2020, the Hoover Burger King's Brinks safe was damaged in a robbery and stopped working.  (Doc. 59-1, p. 9, tp. 29:5–19; Doc 59-5, p. 77).  When the Brinks safe worked, cash receipts automatically dropped into the safe, and Brinks visited the store once a week to collect the deposits.  (Doc. 59-1, p. 8, tp. 28:7–16).  After the safe was damaged, Mr. Singleton began depositing the store's cash receipts at a bank.  (*See* Doc. 59-6, p. 9, tp. 30:7–10).  Mr. Singleton often deposited the cash receipts late.  (Doc. 59-5, p. 21, tp. 77:15–80:14; Doc. 59-7, p. 9, tp. 29:5–12). [3]

Between June 10, 2020, and August 14, 2020, a Premier payroll assistant, Emily Cassidy, emailed Mr. Singleton several times to discuss a late deposit.  (Doc. 59-7, p. 12, tp. 44:2-6, pp. 53–67).[4]  Ms. Cassidy copied Premier's Area Director, Valerie Smith, on many of the emails.  (Doc. 59-7, pp. 53–67).  On July 20, 2020, Ms. Cassidy sent a message to Mr. Singleton and Ms. Smith in which she stated:  "I am missing a deposit for 6/25 in the amount of $1,220.  I do not see where this has been deposited. Please get this to me ASAP!"  (Doc. 59-7, p. 60).  Two weeks after Ms. Cassidy sent her message about the missing deposit, a new safe was installed at the Hoover Burger King, and money again dropped into the safe, indicating that the

---

[3] Mr. Singleton's late deposits violated Premier's written policies, including the Inventory and Security Control Policies and Procedures and Manager Card Policy, (Doc. 59-1, pp. 58–61); the policy manual which states that "all cases of employee theft or misappropriation of company assets in any form" will result in termination and prosecution, (Doc. 59-1, p. 120); and the employee handbook providing that Premier "has a strict cash handling policy."  (Doc. 59-1, p. 130).

[4] Ms. Cassidy's maiden name, Youman, appears on her communications. (*See* Doc. 59-7, p. 3–4, tpp. 8:23–9:7).

safe worked properly.  (Doc. 59-5, p. 16, tp. 58:7–21, p. 60).  Nevertheless, Mr. Singleton continued to make cash deposits at the bank until the fire on September 8, 2020.  (Doc. 59-5, pp. 23, 71–73, tp. 89:10–91:13).

The Hoover Police Department investigated the fire and missing cash deposit. (Doc. 59-3, pp. 93–95, 97–98).  On September 23, 2020, Jessica Wilson, an assistant office director and payroll associate at Premier, emailed a Hoover detective a spreadsheet identifying the late bank deposits Mr. Singleton made beginning with a June 22, 2020 deposit.  (Doc. 59-5, p. 12, tp. 42:18-43:16, pp. 60–73).   Ms. Wilson wrote:

> Attached are all the documents for all the deposits. I have also created a spreadsheet so you could see clearly how many days deposits were late and when the safe should have started being used. Please let me know if you need any more information. Here are a few bullet points:
>
> - Store's safe was damaged in a robbery the weekend of 05/23-05/24. - 05/27 is when the deposits started going to the bank.
> -When checking the deposits from May until August 9th I noticed they started to be late around 06/22/2020. I have provided my hand written notes in the attachments.
> -The deposit attachment also shows that he would wait days to make 3-4 deposits at once.
> -The Brinks safe should have started being used 08/07/2020 because you will see it transmitted for $2.00 which is our "test" drop to make sure the safe is working.
> -There is one deposit that stands out to me, which you will see in the attached, that was for $1,220.00 made on 07/20/20. This deposit is actually for the 06/25/20 deposit day. This was deposited almost one month after. One of the other girls in the office spoke to Valerie about this deposit and said they were missing this deposit for quite some time and then one day it appeared in the store's change safe in the back of the safe.

(Doc. 59-5, p. 60).

The day after the fire at the Hoover Burger King, Premier submitted a Property Loss Notice to Lyndon for damages the restaurant suffered in the fire. (Doc. 13-1). Lyndon acknowledged the claim and listed the "Type of Loss" as "Fire." (Doc. 13-2). Lyndon hired Frontier Adjusters to investigate and adjust the claim. (Doc. 59-10, p. 27, 65, tp. 26:1–7, tp. 64:9–18; Doc. 60-3, p. 22, tpp. 82:22–83:4; Doc.13-4). Adjuster Kevin Clark investigated the fire for Frontier. (See Doc. 13-4, p. 8). Premier hired Goodman Gable Gould, a public adjusting firm, to assist Premier in the adjustment process. (Doc. 59-3, p. 6, tp. 17:23–18:4). The firm assigned the matter to Robert Ingram, one of their adjusters. (Doc. 59-3, pp. 6–7, tpp. 20:3–21:21).

In mid-October 2020, Frontier submitted a report to Lyndon. (Doc. 13-4). Frontier advised: "The cause of loss on this claim is fire and we do not see any coverage limitations or exclusion applicable to this peril." (Doc. 13-4, p. 3). Frontier indicated that it would "work[] with the insured's representatives to reach an agreement" as to the value of Premier's claim. (See Doc. 13-4, p.8).

Frontier provided another report to Lyndon in early December. Frontier stated that it "[did] not find any coverage issues pertaining to this loss." (Doc. 14-1, p. 3; Doc. 60-8, p. 15, tp. 55:16–23). The report indicated that Lyndon owed Premier $115,748.58. (Doc. 14-1, p. 3; *but see* Doc.13- 3, p. 25, tp. 95:17–96:16 (indicating

that Lyndon owed premier $178,297.47 under the policy, excluding business income loss)).[5]  On January 13, 2021, Premier submitted to Lyndon a sworn proof of loss for $116,254,54 under the policy.  (Doc. 59-1, p. 229).

Lyndon continued investigating the claim.  Sometime around January 28, 2021, Mr. Ingram notified Mr. Clark that Premier's manager of legal services, Cassie Wilson, advised that Premier "discovered stealing on 9/2/20 and the termination paperwork was not submitted until 9/11/20."  (Doc. 59-3, p. 74).  On February 4, 2021, in response to questions Mr. Clark emailed Premier's attorney, Harold Callaway, (Doc. 59-1, pp. 199–200; Doc. 59-3, p. 78–80), Mr. Ingram responded:

> Ms. Cassie Wilson has provided the answers to your questions below. Item #8 will be provided separately once Cassie obtains same.
>
> 1. It is our understanding the night deposit thefts were between September 5th and September 7th, 2020. How was the night deposit thefts discovered? What tipped you off? <u>The Brinks safe was down therefore the store manager (Mr. Singleton) had to take the deposits to the bank. He would wait 3-4 days or longer to make the deposits. This appeared to be floating the deposits. Corporate office checks the deposits daily and would notify the store and Area Director of the missing deposits.</u>
>
> 2. When and by what method was Mr. Singleton notified of your becoming aware of the night deposit thefts? <u>When the nights deposits were not deposited the very next day an email was sent to the store and Area Director.</u>
>
> 3. What was the total of the night deposit thefts?  <u>$3313.82</u>

---

[5] The Policy had a $500,000 limit for building coverage for the Hoover Burger King and  limits of $180,000 for personal property and business income of actual loss sustained.  (Doc. 60-3, p. 11, tp. 37:15–38:6).

4. Cassie Wilson advised that the stealing was discovered on 9/2/2020 and the termination paperwork was not submitted until 9/11/2020. Why the delay in termination? <u>Investigation on who set the fire and why the money was missing. Done by the Area Director and Director of Operations.</u>

5. What happened in the 9 day gap? <u>Investigation as to who took the money and who started the fire.</u>

6. Was he allowed on the premises? <u>Yes until termination date of 09/11/2020.</u>

7. Was he allowed to work? <u>Yes</u>

8. What date (and please provide a copy) was a police report filed for the theft?

9. On the day of fire, 9/8 was he working on that day? <u>Yes</u>

10. What day were his keys taken away? <u>09/11/2020</u>

11. How did he get into premises on 9/8? <u>He had keys to the store. He was the General Manager.</u>

12. When did they discover that he set the fire? How? <u>On 09/11/2020 is when another employee (Assistant Manager) confessed that she knew he started the fire. She spoke to Officer James Davis about this. You could not see on camera who started the fire. Please let us know if you need Detective Davis' contact information.</u>

(Doc. 59-1, pp. 199–200 (answers underlined); Doc. 59-3, pp. 78–80).

In a letter dated February 12, 2021, George Rockas, Lyndon's attorney, informed Mr. Callaway that Lyndon needed additional information regarding Mr. Singleton's theft and asserted that in Lyndon's view, information regarding Mr. Singleton's theft was "relevant to the issue of mitigation." (Doc. 60-7, p. 2).

On March 1, 2021, Ms. Smith sent to Ms. Wilson these answers to questions

Ms. Wilson had posed:

> 1.When did the corporate office notify you about the missing deposits? <u>It started on Sept 2nd when Jessica asked for the weekend deposit slips from Singleton.</u>

> 2. When and by what method was Mr. Singleton notified of you becoming aware of the night deposit thefts? <u>September 2nd through email to Singleton.</u>

> 3. After the theft was discovered, what did Premier do to investigate the thefts? What date did you review the video for 9/2? Did you actually see him putting money in his pocket? What date did you review this? <u>I reviewed the 5th, 6th, and 7th money because this is what I thought was the issue. Not knowing that he used other days funds to correct prior deposits.</u>

> 4. There was a 9 day gap between the discovery of the thefts on 9/2/20 and 9/11/20. Why wasn't Singleton terminated before 9/11/20. <u>Because the store was investigating the issue of deposits missing. He presented deposit slips for the 2nd, 3rd, and 4th after the weekend. We did not know he used the 5th deposit to cover up the shortage. We recognized him getting money from other places and his wallet when investigating the fire on video. On the 8th after the fire he stated he believed he left the deposit on the office desk. After reviewing video footage that was not true.</u>

> 5. Is the only reason we figured out it was Singleton because the assistant manager came forward?  <u>Video footage never showed him leaving money on the desk but it showed him taking out money.</u>

(Doc. 59-2, pp. 156, 158).[6]

---

[6] The email with questions and email with responses are combined for clarity. The answers are underlined.

In a letter dated March 5, 2021, Mr. Callaway responded to a letter from Mr. Rockas in which Mr. Rockas had asked for clarification of answers Premier's director of legal services had given to Mr. Clark.  (Doc. 59-8, pp. 48–49; Doc. 59-8, pp. 43–46).  Mr. Rockas had asked:

> Answer No. 1: The answer does not state when the corporate office notified "the store and Area Director of the missing deposits." On what date did the corporate office conclude there were missing deposits? When did the corporate office notify the store and Area Director of the missing deposits? Is there a reason why the Area Director did not view the video of the safe immediately after being notified of the missing deposits?

> Answer No. 2: On what date was it discovered that night deposits were not deposited the very next day and what is the date of the email referenced in Answer No. 2.

(Doc. 59-8, pp. 44–45).  Mr. Callaway responded:

> 1.) The corporate office contacted the store on 9/2/20 to inquire where the weekend deposits were. At this time, there was no suspicion of any theft taking place.

> 2.) It was discovered on 9/2/20. Deposits from the previous day are supposed to be deposited the next business day. Deposits from Friday, Saturday and Sunday are supposed to be deposited on Monday.

> 3.) On 9/2/20, after Mr. Singleton was asked about the deposit, he immediately went to the bank and made 3 deposits. One for 8/29, 8/30, and 8/31. Then there were deposits made the following day on 9/3/20. Theft was not initially suspected, only that Mr. Singleton hadn't made the deposits. These facts are why the Area Director didn't immediately review the video footage. Ms. Smith didn't review the videos until after the fire occurred on 9/8/20. No one else viewed the video.

(Doc. 59-8, p. 48).  In his letter, Mr. Callaway did not state that Mr. Singleton began making late deposits in June 2020.  (Doc. 59-8, p. 48–49).

On April 1, 2021, Premier held a conference call to discuss the insurance claim regarding the Hoover Burger King fire.  (Doc. 59-3, p. 64).  To facilitate the call, Mr. Ingram emailed a spreadsheet to expected participants including Mr. Callaway, Mr. Rockas, and Mr. Howard.  (Doc. 59-3, pp. 65–66).  The spreadsheet identified missing deposits beginning on August 26, 2020.  (Doc. 59-3, p. 66).  The spreadsheet did not include Mr. Singelton's late deposits that began in June 2020. (Doc. 59-3, pp. 64–66. Doc. 59-6, pp. 87–90).

On April 5, 2021, after a call, Mr. Howard wrote to Ms. Wilson and others: "We went over the facts and tightened up those dates with them last week. That way we will ensure a consistent response and are all on the same page. I think Bob [Ingram] and Harold [Callaway] would benefit from Jenny [Wilson]'s expertise and help with a unified response to those jerks." (Doc. 59-1, pp. 224).

In the complaint it filed on May 3, 2021, Lyndon asked the Court to declare that the insurance company does not owe Premier payment on the Hoover Burger King fire claim because Premier did not fulfill its duty to mitigate.  (Doc. 1). Lyndon's corporate representative testified that the company's decision to seek declaratory judgment was based in part on Alabama common law.  (Doc. 60-3, pp. 16, 20–21, tpp. 57:17–59:2, 76:8–77:22).  The corporate representative, who made

the decision to withhold payment on Premier's claim, could not recall an Alabama case on which Lyndon relied, (Doc. 60-3, pp. 14–15, tpp. 50–56), nor could the representative recall another claim Lyndon denied based on common law instead of an insurance policy's terms, (Doc. 60-3, pp. 21–22, tpp. 79:7–81:13).

In June 2022, Lyndon amended its complaint. Lyndon now asks the Court to declare that it does not owe Premier payment because Premier intentionally misrepresented or concealed material facts regarding the fire claim, including the date Premier discovered Mr. Singleton's theft of bank deposits. (Doc. 21). Lyndon bases its misrepresentation theory in part on Premier's failure to give Lyndon the spreadsheet Premier sent to Hoover Police during the claim investigation process. (See Doc. 64, pp. 20–24; *compare* Doc. 59-5, pp. 60–73 *with* Docs. 59-3, p. 74, 59-1, pp. 199–200; Doc. 59-2, pp. 156–158, Doc. 59-3, pp. 64–66). Mr. Callaway testified that, to his knowledge, Premier did not "withhold anything" during the claim investigation. (Doc. 59-1, p. 19, tp. 72:10–11). Mr. Callaway also testified that, if the spreadsheet was not disclosed during the claims investigation process, "it should have been." (Doc. 59-1, p. 19, tp. 72:1–3).

### III.

### ***

In its amended complaint, Lyndon alleges that it does not owe Premier payment because Premier "failed to mitigate its losses by taking immediate action

14

to prevent further losses once it learned that Singleton was stealing money," (Doc. 21, p. 12, ¶ 49), "breached the terms of the policy by failing to mitigate its damages," (Doc. 21, p. 13, ¶ 53–54), "misrepresented and concealed material information with an actual intent to deceive," (Doc. 21, p.14, ¶ 57), and "breached the 'Concealment, Misrepresentation or Fraud' provision of the Policy," (Doc. 21, p. 15, ¶ 61). Lyndon seeks a declaration concerning its obligation to pay Premier's claim. (*See generally* Doc. 21). In its motion for summary judgment, Lyndon renews its request for that declaration and seeks judgment in its favor on Premier's breach of contract and bad faith claims. (Doc. 62, p. 1). In its cross-motion for partial summary judgment, Premier seeks judgment in its favor on its breach of contract claim. (Doc. 60, p. 1).

Under Alabama law, "[g]eneral rules of contract law govern an insurance contract." *Safeway Ins. Co. of Alabama v. Herrera*, 912 So. 2d 1140, 1143 (Ala. 2005) (citing *Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co.,* 817 So. 2d 687, 691 (Ala. 2001)). Courts therefore enforce unambiguous terms in an insurance policy "as written." *Safeway Ins. Co.*, 912 So. 2d at 1143 (citing *Twin City,* 817 So. 2d at 691).

Lyndon issued Premier an insurance policy that covered the Hoover Burger King and was effective on the date of the fire. (Doc. 59-9, pp. 5 –56). The policy protects Premier against "[d]irect physical loss," including "fire." (Doc. 60-1, p. 27; Doc. 60-3, p. 12, tpp. 41:21–42:4). And the policy entitles Premier to compensation for loss of or damage to buildings, business personal property, and business income

at the Hoover Burger King premises. (Doc. 60-1, p. 31; Doc. 60-1, p. 26). Lyndon therefore is entitled to summary judgment in its favor on its declaratory judgment action only if there is no genuine dispute as to any material fact regarding at least one of Lyndon's defenses, and Lyndon is entitled to judgment on that defense as a matter of law.

Lyndon argues that it has no duty to pay Premier's claim because Premier "failed to mitigate the loss by preventing it from happening." (Doc. 64, p. 16). According to Lyndon, Premier had a duty under its insurance policy and under Alabama law to mitigate by suspending or terminating Mr. Singleton months before the September 8 fire when Premier discovered that Mr. Singleton was making late bank deposits. (*See* Doc. 64, pp. 17–19). For its mitigation argument concerning Premier's insurance policy, Lyndon relies on the "Duties in the Event of Loss or Damage" provision in the policy. That provision states:

> You must see that the following are done in the event of loss or damage to Covered Property:
>
> . . .
>
> (4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, . . .

(Doc. 60-1, p. 50). The policy expressly requires Premier to protect property from "further damage" only "in the event of loss or damage to covered property;" the policy does not require Premier to anticipate a fire loss and mitigate before the loss

16

or damage occurs. *See Ex parte Haponski*, 395 So. 2d 971, 972 (Ala. 1981) (stating that, in contracts, the "specific mention of one of a class of things implies the exclusion of those items not mentioned"); *In re Celotex Corp.*, 487 F.3d 1320, 1334 (11th Cir. 2007) (stating that "'when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded'") (quoting *Plumbers & Steamfitters Local No. 150 Pension Fund v. Vertex Constr. Co.*, 932 F.2d 1443, 1449 (11th Cir. 1991)).

Lyndon's argument concerning Alabama law fares no better; Alabama law did not impose on Premier a duty to mitigate under the circumstances that led to the fire at the Hoover Burger King. Lyndon asserts that Premier "can recover only for damage that would have been sustained if [it] had exercised such care as a reasonably prudent person would have exercised under like circumstances." (Doc. 64). True, plaintiffs generally have a duty to mitigate damages under Alabama law, *see, e.g.*, *Avco Fin. Servs., Inc. v. Ramsey*, 631 So. 2d 940, 942 (Ala. 1994), but this duty arises after an action or event that causes damage, *see CSX Transp., Inc. v. Miller*, 46 So. 3d 434, 454 (Ala. 2010) ("The duty to mitigate damages arises after a party has suffered injury, loss, or damage"). The duty is not anticipatory. *See Britton v. Doehring*, 242 So. 2d 666, 671 (Ala. 1970) (holding that a plaintiff did not fail to mitigate damages arising out of an accident when she did not fasten her seat belt

before the alleged wrongdoing).  So, Premier did not violate its duty to mitigate under Alabama law by failing to prevent the fire before it occurred.

Under Alabama law, a party must mitigate damages only if the damages "are reasonably foreseeable and the effort to avoid them will not entail undue risk." *Gradco, Inc. v. St. Clair Cnty. Bd. of Educ.*, 477 So. 2d 365, 368 (Ala. 1985).[7] Lyndon argues that, "given Singleton's criminal history and history of stealing from Premier, it was clear that something 'bad' could happen" because "'bad' people . . . do bad things." (*See* Doc. 69, p. 4).  The Court is not persuaded.  Mr. Singleton's delayed bank deposits may have left Premier vulnerable to theft and financial loss, but whether a reasonable person would foresee that a manager who was "floating deposits" later would set fire to his employer's building is a question for a fact-finder.  *Avco Fin. Servs., Inc. v. Ramsey*, 631 So. 2d 940, 942 (Ala. 1994) (stating that "[w]hether the plaintiff has sufficiently mitigated the damages, generally speaking, is a question of fact").

Therefore, Lyndon is not entitled to summary judgment on the grounds that Premier failed to mitigate its damages.

---

[7] Lyndon purports to quote the Restatement (Second) of Contracts § 435 to support the proposition that when an actor's conduct is a "substantial factor in bringing about the harm . . . the fact that the actor neither foresaw nor should have foreseen the extent of the harm or manner in which it occurred does not prevent him from being liable." (Doc. 80, p. 4). The section quoted appears in the Restatement (Second) of Tort, not Contracts, and contributory negligence is not a defense to a breach of contract claim.  *See Watts v. Talladega Fed. Sav. & Loan Ass'n*, 445 So. 2d 316, 318 (Ala. Civ. App. 1984).

Lyndon also contends that, as a matter of law, it has no duty to pay Premier policy benefits because Premier made misrepresentations that void the policy. (Doc. 64, p. 19–24). According to Lyndon, Premier violated a policy provision prohibiting concealment and misrepresentation in the claims process and similarly violated Alabama law because Premier "fail[ed] to disclose Singleton's history of late deposits during the claims investigation process." (Doc. 64, p. 20). The misrepresentation provision in Premier's policy reads:

> This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceals or misrepresents a material fact concerning:
>
> 1. This policy;
> 2. The Covered Property;
> 3. Your interest in the Covered Property; or
> 4. A claim under this policy.

(Doc. 59-9, p. 80).

Under Alabama law, a misrepresentation in a proof of loss under an insurance policy voids the policy if the misrepresentation "is made with actual intent to deceive as to a matter material to the insured's rights under the policy." ALA. CODE §27-14-28. Thus, under the policy and under Alabama law, Lyndon is entitled to summary judgment based on a misrepresentation in Premier's claim only if there is no genuine dispute that Premier intentionally misrepresented a fact and that such fact was material to Premier's rights under the policy.

Under Alabama law, a matter is material to an insured's rights under an insurance policy if it "is a fact that will induce action or inaction" by the insurer. *See Ex parte Liberty Nat. Life Ins. Co.*, 797 So. 2d 457, 465 (Ala. 2001) (interpreting the materiality element of fraudulent misrepresentation under Alabama law). "A representation that causes a person to do nothing more than he was already contractually obligated to do before the representation was made is not material." *Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc.*, 611 So. 2d 238, 244 (Ala. 1992).[8]  Lyndon contends that Premier's misrepresentations concerning Mr. Singleton's thefts are material because "Premier knew that Lyndon . . . had raised concerns about the failure to mitigate, and had asked questions about the late deposits and Mr. Singleton." (Doc. 64, p. 21).  In Lyndon's view, information regarding Mr. Singleton's late deposits "went to the heart of Lyndon's claim

---

[8] *First Financial Insurance Co.,* 626 So. 2d 1252, interprets ALA. CODE § 27-14-7, which governs the effect of misrepresentations in applications for insurance.  Due to the similarities in the statutes, their similar context in the insurance code, and the comparative lack of Alabama law interpreting § 27-14-28, *First Financial Insurance Co*., 626 So. 2d 1252, indicates how Alabama courts would interpret the materiality requirement of §27-14-28.

As to evidence concerning misrepresentations in the claim process, the record demonstrates that some of Premier's employees provided incomplete information about Mr. Singleton's handling of bank deposits, (*see* Doc. 59-1, pp. 192, 175–88), but Mr. Howard testified that Premier did not intentionally withhold any documents during the claims process, (Doc. 59-1, p. 19, 71:20 – 72:14). Ms. Wilson and Victoria Smith testified that they did not discover Mr. Singleton's theft until September 2, 2020 because they believed that Mr. Singleton's earlier late deposits were the result of "an issue with the bank" during COVID.  (Doc. 72-4, p. 15–16, tpp. 53:17–58:16; *see also* Doc. 72-3, p. 37, tp. 144:1–19).  Ms. Smith testified that she did not suspect Mr. Singleton of theft before the fire because she "always found that Singleton had made the deposits."  (Doc. 72-4, p. 15–16, tpp. 53:17–58:16; *see also* Doc. 59-1, p. 20–21, 29, tpp. 69:12–70:11, 76:14–77:4).

investigation." (Doc. 64, p. 23). But Lyndon's reliance on failure to mitigate based on Mr. Singleton mishandling bank deposits has no basis in Premier's policy or in Alabama law. Therefore, the information that Premier omitted about Mr. Singleton's delayed bank deposits in the summer of 2020 is irrelevant to Premier's rights under the policy and the determination of whether Lyndon owes Premier payment of its claim. As a matter of law, the information is not material to a contractual or legal defense to Premier's claim. Therefore, Lyndon is not entitled to summary judgment on misrepresentation grounds.

Because Lyndon has not demonstrated that it is entitled to summary judgment on its failure to mitigate or misrepresentation defense, it is not entitled to summary judgment on its declaratory action and Premier's claim for breach of contract.

On the other hand, Premier may be entitled to summary judgment on its contract claim. As discussed, the parties' insurance contract obligates Lyndon to pay Premier's insurance claim unless the insurance company has a valid defense. Neither the language of Premier's policy nor Alabama law provides Lyndon a defense to Premier's fire claim. Accordingly, Premier would is entitled to summary judgment if Lyndon breached its contract by denying Premier's insurance claim.

Here, Lyndon has not denied Premier's claim outright but instead has withheld payment of the claim pending the outcome of this action. Premier has not addressed in its brief for partial summary judgment whether Lyndon's decision to

withhold payment while pursuing declaratory judgment is a breach of the parties' insurance contract. The Court therefore declines to grant summary judgment for Premier on its breach of contract claim at this time.

***

Turning to Premier's bad faith claim, to prevail on a claim for bad faith failure to pay an insurance claim, Premier must prove:

> (a) an insurance contract between the parties and a breach thereof by the defendant;

> (b) an intentional refusal to pay the insured's claim;

> (c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);

> (d) the insurer's actual knowledge of the absence of any legitimate or arguable reason; [and]

> (e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

*State Farm Fire & Casualty Co. v. Slade*, 747 So. 2d 293, 304 (Ala. 1999) (quoting *National Sec. Fire & Casualty Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982)). "The plaintiff must show that the insurance company had no legal or factual defense to the insurance claim." *Bowen*, 417 So. 2d at 183. A plaintiff may also establish an "abnormal" bad faith claim by showing that the insurance company "manufacture[d] a debatable reason to deny a claim." *See Slade*, 747 So. 2d at 306–07. Lyndon

argues that it is entitled to summary judgment on Premier's bad faith claim because there is no coverage under the Policy due to Premier's alleged misconduct and because the company had a reasonable or arguable basis for not paying the claim and seeking a declaration from the Court regarding the parties' rights under Premier's policy.  (Doc. 64, pp. 28–29).[9]

Ordinarily, a plaintiff's bad faith claim may proceed to trial only if "the proof offered . . . show[s] that the plaintiff is entitled to recover on the contract claim as a matter of law," *Nat'l Sav. Life Ins. Co. v. Dutton*, 419 So. 2d 1357, 1362 (Ala. 1982), but the "directed verdict test" does not absolutely require that "the tort claim be barred unless the trial court has literally granted the plaintiff's motion for a directed verdict on the contract." *Safeco Insurance Co. of America v. Sims*, 435 So. 2d 1219, 1223 (Ala. 1982); *see Dempsey v. Auto Owners Ins. Co.*, 717 F.2d 556 (11th Cir. 1983) (finding that district court did not err in submitting the plaintiff's bad faith claim to a jury even though the court did not direct a verdict for the plaintiff on the plaintiff's contract claim).

Here, viewed in the light most favorable to Premier, the evidence demonstrates that when Lyndon filed its complaint in this action, Lyndon had

---

[9] Lyndon contends that it is entitled to summary judgment because Premier has not shown that Lyndon intentionally failed to investigate the fire claim.  Because such showing is not necessary for Premier to establish a claim for bad faith in this matter, the Court declines to address this argument.

21-cv-622 Summary Judgment Memo Op V.2

decided not to pay Premier's claim solely because of Premier's alleged failure to mitigate. (*See* Doc. 60-3, p. 13, p. 20, tpp. 47:22–48:8, 73:10–74:12). As discussed, the law does not support Lyndon's failure to mitigate defense to Premier's claim.

Similarly, Lyndon cannot rely on Premier's alleged misrepresentations, that Lyndon learned of after filing this lawsuit, to defeat Premier's allegations of bad faith. *See Slade*, 747 So. 2d at 317 n.6 ("[I]nformation received by the insurer after the date of the denial is irrelevant to the determination of whether the insurer denied at that date in bad faith.") (quoting *Insurance Co. of N. Am. v. Citizensbank of Thomasville*, 491 So. 2d 880, 883 (Ala. 1986)); *Gonzalez v. Blue Cross/Blue Shield of Alabama*, 689 So. 2d 812, 818 (Ala. 1997) (abrogated on other grounds, as recognized by *Ex parte Prudential Ins. Co. of America*, 785 So. 2d 348, 350 (Ala. 2000)) ("An insurer "cannot defeat a bad faith claim by advancing reasons for the denial, no matter how valid, that were discovered only after it had rejected an investigation of the claim."). Accordingly, if Premier succeeds on its breach of contract claim, it may proceed with its bad faith claim.

Lyndon's decision not to formally deny the claim does not require judgment for Lyndon on Premier's bad faith failure to pay claim. Premier may establish a constructive denial under Alabama law "(1) by showing that the passage of time is so great that the delay alone creates a denial; or (2) by showing sufficient delay in payment coupled with some wrongful intent by the insurance company." *Slade*, 747

So. 2d at 317, n.6 (quoting BARRY D. WOODHAM, Comment, "*Constructive Denial,*" "*Debatable Reasons," and Bad Faith Refusal to Pay an Insurance Claim—The Evolution of a Monster*, 22 CUMB. L.REV. 349, 361 (1992)); *see Livingston v. Auto Owners Ins. Co.*, 582 So. 2d 1038, 1041–42 (Ala. 1991) (finding that insurer's "investigative tactics" and delay in paying the claim "amounted to a denial of the claim"). Premier submitted a property loss notice to Lyndon on September 10, 2020. (Doc. 13-1). Lyndon acknowledged the claim shortly afterwards. (Doc. 13-2). On January 13, 2021, Premier submitted a sworn proof of loss detailing its damages. (Doc. 59-1, p. 229). Nearly four years later, Lyndon has not paid Premier's claim even though Lyndon's adjuster reported in mid-October 2020, that: "[t]he cause of loss on this claim is fire and we do not see any coverage limitations or exclusion applicable to this peril." (Doc. 13-4, p. 3). Accordingly, a reasonable jury could find that Lyndon constructively denied Premier's claim by filing a declaratory judgment action and delaying payment.

Factual questions also exist concerning Lyndon's knowledge of the legitimacy of its stated reason to deny coverage. Although an insurer's decision to seek a declaratory judgment regarding coverage may be probative of a good faith belief of grounds for denying a claim, the effort does not automatically bar an insured's bad faith claim. *See Sims*, 435 So. 2d at 1224 ("If . . . the refusal to pay is without legal excuse, the mere filing of a declaratory judgment action, followed by a finding of

justiciable controversy, may enhance rather than diminish the degree of bad faith.")
(Jones, J., concurring specially).

As discussed, Lyndon's reliance on Premier's purported failure to mitigate as
a basis for denying coverage lacks support in Premier's policy and Alabama law. To
date, Lyndon has not identified an opinion from any court, much less binding
authority, that supports Lyndon's novel theory that, to prevent a fire at the Hoover
Burger King, Premier had a duty to suspend or terminate Mr. Singleton's
employment as soon as Premier became aware of issues with bank deposits. Setting
aside the fact that there is no provision in Premier's policy that would have provided
notice to Premier that it had such an obligation, there is no logical basis for Lyndon's
presumption that Mr. Singleton would not have set fire to the restaurant if Premier
had suspended him or fired him. Had Premier suspended or fired Mr. Singleton, he
still may have set fire to the restaurant to destroy evidence of his theft or to punish
Premier for a perceived injustice. Alabama law is crystal clear: an employer is not
responsible for the criminal acts of an employee. *See E. Alabama Behav. Med., P.C.
v. Chancey*, 883 So. 2d 162, 166 (Ala. 2003) ("The law in Alabama is well settled
that an employer is not liable for the intentional acts of its employee unless the acts
were committed within the scope of the employee's employment or were done to
further the interests of the employer."); *Roberson v. Allied Foundry & Mach. Co*.,
447 So. 2d 720, 722 (Ala. 1984) (holding that an employer did not owe third parties

a duty to prevent criminal acts of state work release employees).  Lyndon's corporate representative admitted that he did not recall a case that supported Lyndon's mitigation theory.  (Doc. 60-3, pp. 14–15, tpp. 50–56).  Viewing this evidence in the light most favorable to Premier, a reasonable jury could find that Lyndon "manufactured" its mitigation defense as an arguable basis to delay or avoid  paying Premier's claim.

Therefore, Lyndon is not entitled to summary judgment on Premier's bad faith claim.

## IV.

For the above reasons, the Court denies Lyndon's motion for summary judgment and denies Premier's motion for partial summary judgment in its favor on the breach of contract claim.

Pursuant to Fed. R. Civ. P. 56(f), the Court will examine Premier's breach of contract claim to determine whether an insurance company's delay of payment may constitute a constructive denial of coverage for purposes of  a breach of  contract claim.  Within 21 days of this order, Premier shall please file a supplemental brief explaining whether Lyndon's withholding of payment under these circumstances is tantamount to denial of Premier's claim and constitutes a breach of the parties' insurance contract as a matter of law.  Lyndon may file a response within 14 days, and Premier may have 7 days to file its reply, if any.

21-cv-622 Summary Judgment Memo Op V.2

Because the Court did not need to consider the evidence Premier addresses in its motions to strike and exclude testimony to reach its decision, these motions are moot. The Court will consider Premier's evidentiary objections if it chooses to raise them in pre-trial motions.

The Clerk of Court shall please term Docs. 60, 62, 63, 73, and 74.

**DONE** and **ORDERED** this September 25, 2025.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE